An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-832

Filed 20 August 2025

Cumberland County, No. 23JA000321-250

IN THE MATTER OF: V.H.

Appeal by Respondent-Mother from orders entered 5 March 2024 and 4 June 2024 by Judge Luis Olivera in Cumberland County District Court. Heard in the Court of Appeals 24 April 2025.

*Peter Wood for Respondent-Appellant-Mother.*

*N.C. Guardian Ad Litem Program, by Michelle FormyDuval Lynch, for the Guardian ad Litem.*

*Cumberland County Department of Social Services, by Dawn M. Oxendine, for Petitioner-Appellee.*

CARPENTER, Judge.

Respondent-Mother appeals from the trial court's 5 March 2024 adjudication order (the "Adjudication Order") and 4 June 2024 disposition order (the "Disposition Order") suspending supervised visitation with her daughter, V.H. ("Velma").[1] On

---

[1] A pseudonym is used to protect the identity of the juvenile and for ease of reading. *See* N.C. R. App. P. 42(b).

appeal, Respondent-Mother argues the trial court abused its discretion by suspending her visitation with Velma. After careful review, we affirm.

## I. Factual & Procedural Background

Velma was born in June 2021 to Respondent-Mother and Father, who since passed away. Respondent-Mother has a history of mental health issues, including split personality disorder, post-traumatic stress disorder, depression, and suicidal ideations. In 2015 and 2016, Respondent-Mother's two older children were removed from her care.

From June 2022 to December 2022, Respondent-Mother routinely allowed her friend, a known drug dealer, to care for Velma while Respondent-Mother was at work and attending medical appointments. While in the drug dealer's home, Velma played with a bag of fentanyl. On one occasion in December 2022, after Respondent-Mother left Velma alone with the drug dealer while she went to work, Respondent-Mother noticed Velma had vaginal discharge. Respondent-Mother contacted law enforcement and took Velma to the emergency room. Medical providers tested Velma for sexually transmitted diseases ("STDs") three times. The first test, performed on 29 December 2022, came back positive for gonorrhea, but the subsequent tests on 1 July and 12 July 2023 came back negative.

A child medical examiner who evaluated Velma expressed "great concern" about Velma being cared for by a known drug dealer. Despite a lack of conclusive

evidence of sexual abuse, medical providers contacted Cumberland County Department of Social Services ("DSS") due to concerns over Velma's exposure to drugs. After investigating, DSS created a case plan for Respondent-Mother to promote Velma's safety. The case plan required Respondent-Mother to refrain from contacting the drug dealer, find an alternate babysitter, closely supervise Velma, child-proof Respondent-Mother's home, and continue taking Velma for medical care and STD tests. On 4 June 2023, DSS determined Respondent-Mother substantially achieved the goals of her case plan and closed the case.

From 5 June until 28 June 2023, Respondent-Mother resided in a two-bedroom home with Velma, three other adults, and another child. Respondent-Mother often allowed her roommates to care for Velma while Respondent-Mother was at work. During this time, Respondent-Mother began a romantic relationship with a registered sex offender, who had been convicted of forcible sodomy with a child under the age of one. Respondent-Mother allowed her boyfriend to spend the night, sleep in the room she shared with Velma, and change Velma's diaper. On one occasion, Respondent-Mother stayed home from work due to "stomach issues" and heard Velma screaming and crying while Respondent-Mother's boyfriend changed Velma's diaper. Despite Velma's cries, Respondent-Mother did not check on Velma because Respondent-Mother "didn't really thin[k] anything of it due to the fact that [Respondent-Mother] was in and out because of [her] pain."

On 28 June 2023, one of Respondent-Mother's roommates observed vaginal discharge while changing Velma's diaper. Knowing Respondent-Mother's boyfriend was a registered sex offender, the roommate contacted law enforcement. A responding detective contacted Respondent-Mother while she was at work to inform her that Velma needed to go the hospital. Respondent-Mother advised that she would take Velma to the hospital when she got home from work. Instead, EMTs arrived at the home and transported Velma to the hospital. At the end of the work day, Respondent-Mother was "not pleased" to learn that Velma had already been transported to the hospital, and traveled there to meet Velma.

At the hospital, medical providers, including Dr. Danielle Thomas Taylor, determined Velma had a mild yeast infection, severe diaper rash, rectal healing consistent with sexual trauma, lesions to her labia minora, and abrasions on her right buttock. Additionally, medical providers observed dirt and sand all over Velma's body and identified two ringworm infections. Due to concerns of sexual abuse, medical providers contacted DSS. On 30 June 2023, Respondent-Mother agreed to have Velma moved to a temporary placement while Respondent-Mother worked with DSS to engage in services. In July 2023, Respondent-Mother moved in with her boyfriend and his roommate, who was also a registered sex offender. Respondent-Mother was aware that her boyfriend and his roommate were registered sex offenders.

On 9 November 2023, DSS filed a petition alleging that Velma was a neglected

juvenile. Specifically, the petition alleged Velma had experienced vaginal discharge on two occasions after Respondent-Mother left Velma alone with the drug dealer and Respondent-Mother's boyfriend. Further, the petition alleged Velma had experienced sexual trauma, and that Respondent-Mother knowingly resided with two registered sex offenders. Finally, the petition alleged that the home Respondent-Mother shared with the sex offenders was covered in animal urine and feces, was infested with roaches and fleas, and had unstable flooring.

On 30 November 2023, DSS and the Guardian ad Litem ("GAL") filed for nonsecure custody of Velma, which the trial court granted that same day. The trial court permitted Respondent-Mother a minimum of one hour of supervised visitation with Velma per week. Respondent-Mother exercised her visitation with Velma, but Respondent-Mother's behavior during visitation concerned the social worker.

On two occasions during visitation, Respondent-Mother indicated that she had to use the bathroom, but would enter the bathroom and "just stand there." When Respondent-Mother exited the bathroom after not using it, she told the social worker she was "ready for [Velma] to come in" the bathroom. When Respondent-Mother took Velma into the bathroom, Respondent-Mother brought the diaper bag with her. The social worker was unable to verify the contents of the diaper bag. Additionally, Respondent-Mother would FaceTime unknown individuals during visitation, contrary to the social workers' instructions. To monitor Respondent-Mother and

ensure she was not FaceTiming "inappropriate individuals" while in the bathroom with Velma, the social worker required that Respondent-Mother leave the bathroom door open.

On 8 February 2024, the trial court held adjudication and temporary disposition hearings. The trial court considered evidence presented by DSS, the GAL, and Respondent-Mother and found that Velma did not receive proper care, supervision, or discipline from Respondent-Mother. The trial court further found that Velma lived in an environment injurious to her welfare and that Velma's symptoms were indicative of sexual abuse. On 5 March 2024, the trial court entered the Adjudication Order, concluding Velma was a neglected juvenile.

Thereafter, the trial court proceeded to a temporary disposition hearing where it addressed Respondent-Mother's visitation with Velma. The social worker, despite not explicitly recommending the trial court cease visitation, testified regarding Respondent-Mother's behavior during supervised visitation. The social worker discussed Respondent-Mother's "issues" when taking Velma to the bathroom and Respondent-Mother's continued phone use, despite the social worker's instructions to the contrary.

Respondent-Mother testified that she was currently living with her boyfriend, who she knew was a registered sex offender. Respondent-Mother further testified that she did not believe her boyfriend would harm Velma or that Velma had been

sexually abused. In response to the social worker's testimony regarding Respondent-Mother's behavior during visitation, Respondent-Mother assured the trial court that she could visit Velma without her phone if ordered to do so.

Following the hearing, the trial court entered a temporary disposition order (the "Temporary Disposition Order"), suspending Respondent-Mother's visitation with Velma. In the Temporary Disposition Order, the trial court found, in pertinent part:

> 17. As a result of the above findings and Respondent Mother's unknown activities in the restroom with the juvenile, this Court has determined that it is in the best interest of the juvenile that Respondent Mother's visitation be ceased. Respondent Mother should not be allowed visitation with the juvenile. Visitation with Respondent Mother is not in the best interest of the juvenile and is not consistent with her health, safety, and welfare. Respondent Mother is not a fit and proper person to for visitation with the juvenile.

On 29 April 2024, the trial court conducted the disposition hearing. Both DSS and the GAL recommended visitation remain suspended. DSS also informed the trial court that Respondent-Mother had not provided any verification that she was participating in mental health services, despite her claim that she engaged in services through Carolina Outreach. Respondent-Mother testified that she wished for her visitation with Velma to resume.

On 4 June 2024, the trial court entered the Disposition Order, continuing its suspension of Respondent-Mother's supervised visitation. In the Disposition Order,

the trial court took judicial notice of several findings of fact from the Adjudication

Order and Temporary Disposition Order, excluding finding of fact 17. The trial court

found that Respondent-Mother did not appreciate the danger to Velma created by

Respondent-Mother's decision to reside with registered sex offenders. Further,

Respondent-Mother appeared to prioritize her relationship with her boyfriend over

creating a safe home environment for Velma. Finally, the trial court found that

Respondent-Mother was not currently seeking any form of mental health treatment

and noted that her two older children had previously been removed from her care.

Based on these findings, the trial court concluded:

> 6. Respondent Mother should not be allowed visitation with
> the juvenile. Visitation with Respondent Mother is not in
> the best interest of the juvenile and is not consistent with
> her health, safety, and welfare. Respondent Mother is not
> a fit or proper person for visitation with the juvenile.

On 3 July 2024, Respondent-Mother filed written notice of appeal.

## II. Jurisdiction

This Court has jurisdiction under N.C. Gen. Stat. § 7B-1001(a)(3) (2023).

## III. Issue

The sole issue is whether the trial court abused its discretion by suspending

Respondent-Mother's visitation with Velma.

## IV. Analysis

Respondent-Mother argues the trial court abused its discretion by suspending

her visitation with Velma. Specifically, Respondent-Mother asserts the trial court arbitrarily suspended visitation contrary to the evidence presented at the hearing. For the reasons outlined below, we conclude the trial court did not abuse its discretion.

Visitation orders must be made with the best interest of the juvenile at the forefront. *See* N.C. Gen Stat. § 7B-905.1(a) (2023). At the disposition stage, we review "visitation determinations for abuse of discretion." *In re A.P.*, 281 N.C. App. 347, 359, 868 S.E.2d 692, 701 (2022) (citing *In re C.M.*, 183 N.C. App. 207, 215, 644 S.E.2d 588, 595 (2007)). When reviewing for abuse of discretion, " 'we defer to the trial court's decision unless it is manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision.' " *In re A.J.L.H.*, 386 N.C. 305, 313, 902 S.E.2d 251, 257 (2024) (quoting *In re K.N.L.P.*, 380 N.C. 756, 759, 869 S.E.2d 643, 646 (2022)). " 'If the trial court's uncontested findings of fact support its conclusions of law, we must affirm the trial court's order.' " *In re D.E.*, ___ N.C. App. ___, ___, 913 S.E.2d 447, 450 (2025) (quoting *Isom v. Duncan*, 279 N.C. App. 171, 175, 864 S.E.2d 831, 836 (2021)).

" '[T]he fundamental principle underlying North Carolina's approach to controversies involving child neglect and custody, to wit, [is] that the best interest of the child is the polar star.' " *In re R.J.P.*, 284 N.C. App. 53, 63, 875 S.E.2d 1, 8 (2022) (quoting *In re Montgomery*, 311 N.C. 101, 109, 316 S.E.2d 246, 251 (1984)). The

purpose of a disposition determination in a juvenile proceeding is to "reflect[] . . . the facts, the needs and limitations of the juvenile, and the strengths and weaknesses of the family." N.C. Gen. Stat. § 7B-100(2) (2023). "An order . . . that continues the juvenile's placement outside the home shall provide for visitation that is in the best interests of the juvenile consistent with the juvenile's health and safety, *including no visitation*." N.C. Gen. Stat. § 7B-905.1(a) (emphasis added); *see In re J.C.*, 283 N.C. App. 486, 490–91, 873 S.E.2d 757, 761 (2022). If the trial court determines, in its sound discretion, that suspending visitation is in the best interest of the juvenile, the trial court must address the issue in its dispositional order and " 'specifically determine that [visitation] would be inappropriate in light of the specific facts under consideration.' " *In re J.L.*, 264 N.C. App. 408, 421–22, 826 S.E.2d 258, 268 (2019) (quoting *In re K.C.*, 199 N.C. App. 557, 562, 681 S.E.2d 559, 563 (2009)).

In the instant case, Respondent-Mother argues the trial court "should have tried a less restrictive solution, rather than cutting off all contact between mother and daughter." Respondent-Mother asserts the trial court erred because it ignored her wishes as well as the wishes of the social worker and Velma. Effectively, Respondent-Mother asks this Court to reweigh the evidence.

The, evidence, however demonstrated Velma had symptoms indicative of sexual abuse. Further, Respondent-Mother's living situation—residing in a home with multiple registered sex offenders—placed Velma at risk of continued abuse. Not

only was Velma exposed to an injurious home environment, Respondent-Mother demonstrated a lack of concern for Velma's safety and well-being. Respondent-Mother denied that Velma was sexually abused and showed no inclination to secure safer housing. Furthermore, Respondent-Mother exhibited concerning behavior during visitation. On several occasions, Respondent-Mother engaged in "unknown activities" in the bathroom with Velma, calling into question whether she was actively facilitating or enabling some form of abusive conduct.

It would exceed the role of this Court to reweigh the evidence because "the trial court's decisions as to the weight and credibility of the evidence, and the inferences drawn from the evidence, are not subject to appellate review." *In re J.M.*, 384 N.C. 584, 591, 887 S.E.2d 823, 828 (2023) (cleaned up). On these facts, the trial court's decision to suspend Respondent-Mother's visitation was neither arbitrary nor manifestly unsupported by reason. Therefore, the trial court did not abuse its discretion. *See In re A.J.L.H.*, 386 N.C. at 313, 902 S.E.2d at 257; N.C. Gen. Stat. § 7B-905.1(a); *In re J.L.*, 264 N.C. App. at 422, 826 S.E.2d at 268. Accordingly, we affirm.

## V. Conclusion

The trial court did not abuse its discretion by suspending Respondent-Mother's visitation with Velma. Accordingly, we affirm.

AFFIRMED.

Judges GORE and FLOOD concur.

Report per Rule 30(e).